## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.*, )<br>STEVEN O. SANSBURY and )<br>JAMES T. BUECHLER, )<br> )<br>      Plaintiffs, )<br> )<br>      v. )<br> )<br>LB&B ASSOCIATES, INC., )<br>LILY A. BRANDON, )<br>F. EDWARD BRANDON, *et al.*, )<br> )<br>      Defendants. )<br> ) | Civil Action No. 07-00251 (EGS)<br><br>JURY TRIAL DEMANDED |

## UNITED STATES' COMPLAINT IN INTERVENTION

### INTRODUCTION

On April 14, 2011, the United States of America ("United States" or "Government") notified the Court of its decision to intervene and proceed with this action as to that portion of Relators' Complaint alleging that LB&B Associates, Inc. ("LBB"), Mrs. Lily A. Liang Brandon ("Lily Brandon"), and Mr. F. Edward Brandon ("Edward Brandon") (collectively, the "LBB Defendants") violated the False Claims Act ("FCA") as to the allegations in the Complaint concerning, regarding, and/or relating to LBB's participation in the 8(a) program under 15 U.S.C. § 637(a). The United States also notified the Court of its decision to decline intervention as to Relators remaining claims and the other Defendants named in Relators' Complaint. The United States, having intervened in this civil action, hereby files the following Complaint in Intervention against LBB, Lily Brandon and Edward Brandon and, through its attorneys, alleges as follows:

1.     The United States brings this action against the LBB Defendants pursuant to the False Claims Act, 31 U.S.C. § 3729, *et seq.* ("FCA") and under common law theories of liability seeking damages and civil penalties.

2.     The Government alleges that LBB, by and through its principals Lily Brandon and Edward Brandon, knowingly and/or recklessly submitted false statements to the United States Small Business Administration ("SBA") in order to obtain and retain Section 8(a) certification under the Small Business Act, 15 U.S.C. § 637(a), which permitted LBB to obtain set-aide contracts from the Government under SBA's 8(a) business development program for small and disadvantaged businesses.

3.     After obtaining Section 8(a) certification, LBB, acting through its principals Lily and Edward Brandon, obtained numerous Government contracts from a host of Government agencies based on misrepresentations that LBB was a legitimate Section 8(a) business concern.

4.     LBB submitted numerous false claims to the Government in the form of invoices on their unlawfully obtained contracts, which impliedly certified that LBB was a legitimate Section 8(a) business concern when it obtained the relevant underlying contract.

5.     As a result of LBB Defendants unlawful actions millions of dollars of Government funds that were designated for businesses owned and controlled by socially and economically disadvantaged persons were instead diverted to LBB; thus, thwarting the purpose and objectives of the Section 8(a) business development program.

## JURISDICTION, VENUE, AND PARTIES

6.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1345, as this action is brought by the United States, and 31 U.S.C. § 3730(a), as the Government asserts claims arising under the FCA.

7.      Venue is proper in this District under 31 U.S.C. § 3732(a), as the LBB Defendants transacted and continue to transact business in the District of Columbia and/or LBB Defendants committed acts proscribed by the FCA in this District.

8.      Plaintiff, the United States of America, through the United States Small Business Administration, administers certification programs for small disadvantaged businesses under the Small Business Act, including Section 8(a) of the Act.  In turn, agencies of the United States, in exercising their independent contracting authorities, rely on SBA certifications, including Section 8(a) certifications that companies are small businesses, owned and controlled by one or more socially and economically disadvantaged individuals.

9.      Relator Steven O. Sansbury is an adult resident of the District of Columbia and was formerly employed by LBB as an Operations & Maintenance Institutional Planner from 2000 until his separation from the company in 2003.

10.     Relator James Buechler is an adult resident of the State of Maryland, and was formerly employed by LBB as an Assistant Project Manager from on or about July 2003 until on or about August 12, 2005.

11.     Defendant LB&B Associates, Inc., is a North Carolina Corporation with its principal place of business in Columbia, Maryland.  From 1995 to 2004, LBB held itself out to be a Section 8(a) certified business that was owned and controlled by one or more socially and economically disadvantaged individuals, namely Lily Brandon.

12.     Defendant Lily A. Liang Brandon is an adult, Asian Pacific American, resident of the State of Maryland.  Lily Brandon purported to be the President and Chief Executive Officer ("CEO") of LBB from its creation through January 1, 2005.

13.     Defendant F. Edward Brandon is an adult Caucasian resident of the State of Maryland.  Edward Brandon purported to be the Chief Operating Officer ("COO") from its creation through January 1, 2005, and since that date has been the President of LBB.

## STATUTORY AND REGULATORY FRAMEWORK

### The False Claims Act

14.     The FCA, 31 U.S.C. § 3729, *et seq.*, provides for the award of treble damages and civil penalties for, among other acts, knowingly or recklessly causing the submission of false or fraudulent claims for payment to the United States Government, knowingly or recklessly using a false record or making a false statement material to a claim, and conspiring to submit false claims, use false records, or make false statements.

15.     At the time Relators' Complaint was filed and the events giving rise to the claims in this action occurred, the FCA provided, in part, that anyone who:

> (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;
>
> (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;
>
> (3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid . . .
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person[.] . . .
>
> For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information -- (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

31 U.S.C. §§ 3729(a)(1)-(3), 3729(b) (2007).

16.     Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 64 Fed. Reg. 47099, 47103 (1999), the FCA civil penalties were adjusted to a range of $5,500 to $11,000 per violation (*i.e.,* for each false claim, false record, or false statement) for violations occurring on or after September 29, 1999.

17.     Congress amended the FCA as a part of the Fraud Enforcement Recovery Act of 2009 ("FERA") on May 20, 2009.  Pursuant to FERA, the FCA continues to prohibit the submission of false claims (31 U.S.C. § 3729(a)(1)(A) (2009)), the use of false statements and records material to a government decision to pay (31 U.S.C. § 3729(a)(1)(B), (G) (2009)), and conspiracies to submit false claims or use false statements and records (31 U.S.C. § 3729(a)(1)(C) (2009)).  The FERA amended FCA also prohibits the concealment or avoidance of obligations to pay or transmit money or property to the Government.  31 U.S.C. § 3729(a)(1)(G) (2009).

**Section 8(a) of the Small Business Act and the Section 8(a) Business Development Program**

18.     SBA's Section 8(a) Business Development Program is an important resource for small businesses seeking business-development assistance.  Named for Section 8(a) of the Small Business Act, this program was created to help small and disadvantaged businesses compete in the marketplace. It also helps these companies gain access to federal and private procurement markets.

19.     Under Section 8(a) of the Small Business Act, 15 U.S.C. § 637(a)(1)(B) and (C), the SBA is "empowered, whenever it determines such action is necessary or appropriate:"

(B) to arrange for the performance of such procurement contracts by negotiating or otherwise letting subcontracts to socially and economically disadvantaged small business concerns for construction work, services, or the manufacture, supply, assembly of such articles, equipment, supplies, materials, or parts thereof,

or servicing or processing in connection therewith, or such management services as may be necessary to enable the Administration to perform such contracts; and

(C) to make an award to a small business concern owned and controlled by socially and economically disadvantaged individual[.]

20.     Pursuant to this statutory language, the SBA promulgated regulations that created the Section 8(a) Business Development Program.

21.     The focus of the program is to provide business development support to small, disadvantaged businesses and allows federal agencies and entities to "set aside" certain contracts for the sole benefit of Section 8(a) program participants.  This process allows small, socially and economically disadvantaged owned and operated businesses to obtain government contracts with little to no competition.

22.     As defined by the program, socially disadvantaged individuals are those individuals who have been subject to racial or ethnic prejudice or cultural bias because of their identity as members of a group without regard to their individual qualities.  African-Americans, Hispanic Americans, Asian Pacific Americans, Native Americans and Subcontinent Asian Americans are presumed to be socially disadvantaged.  *See* 15 U.S.C. § 124.103 (2007).

23.     As further defined by the program, economically disadvantaged individuals are those individuals who are unable to compete in the free enterprise system due to diminished capital and credit opportunities as compared to others in the same business area who are not socially disadvantaged.  *See* 15 U.S.C. § 124.104 (2007).

24.     In order to participate in the Section 8(a) Business Development Program, companies are required to apply to and be certified by the SBA.  *See* 15 C.F.R. § 124.2 (2007).

25.     To qualify as a Section 8(a) program participant, a company must fulfill various requirements, including the following: (i) socially and economically disadvantaged individuals

must unconditionally own at least 51% of the company; (ii) socially and economically disadvantaged individuals must control the company; (iii) the business must fall below certain size thresholds; and (iv) the company must recertify on an annual basis that all of the Section 8(a) requirements, including those concerning ownership and control, still exist.  *See* 15 C.F.R. §§ 124.101-102, 124.105-106, 124.112 (2007).

26.     "Control" in this context requires both that disadvantaged persons have the power to control the company and that such persons actually exercise their authority to control the company.  Further, control includes both the strategic policy setting exercised by boards of directors and the day-to-day management and administration of the company's operations.  That is, a company's management and daily business operations must be conducted by one or more disadvantaged individuals.  *See* 15 U.S.C. § 124.106 (2007).

27.     Non-disadvantaged persons may be involved in the management of a company, but in order to satisfy the "control" test of Section 8(a) no such non-disadvantaged persons may, among other things: (i) exercise actual control of the company; (ii) receive compensation in any form from the company that exceeds that received by the disadvantaged controller absent consent of the SBA; or (iii) provide critical financial or bonding support to the company, which directly or indirectly allows a non-disadvantaged individual to significantly influence the company's business decisions.  *See* 15 U.S.C. § 124.106 (2007).

## STATEMENT OF FACTS

**A.     The Brandons and Edward Brandon's Colleagues Created LBB With Lily Brandon As President Despite Her Lack of Qualifications In Order to Set LBB On the Path to Become a Section 8(a) Business.**

28.     LBB filed articles of incorporation with the Department of the Secretary of State of the State of North Carolina on or about January 15, 1992.

29.     Initially, the Board of Directors of LBB consisted of six directors, namely: (i) Lily Brandon, Edward Brandon, and their son F. Edward Brandon, Jr., (ii) Richard L. Brown and his wife, Katherine Schofield, and (iii) Frederick J. Franz.

30.     The only socially and economically disadvantaged individuals in this group were Lily Brandon and her son F. Edward Brandon, Jr., neither of whom possessed any experience in running a company nor any significant or substantive experience in managing LBB's chief lines of business, namely government contracts, manufacturing, facilities management, and government services.

31.     Whereas, Edward Brandon, Brown, and Franz -- who knew each other through prior business dealings -- each had extensive experience in the upper levels of government contracting businesses and had managed and supervised staff in government contracts, manufacturing, facilities management, and government services.

32.     Notably, Edward Brandon was aware of the Section 8(a) program before LBB was incorporated, and immediately prior to becoming directors Brown and Franz had been executives at another Section 8(a) company.

33.     Despite her lack of relevant experience, especially compared with the wealth of relevant experience held by Edward Brandon, Franz, and Brown, the directors selected Lily Brandon as the putative President of LBB.

34.     Further, although each of the three groups noted above contributed an equal amount to initially fund LBB ($20,000), Lily Brandon's contribution was treated fully as an equity contribution whereas a majority of the other groups' contributions ($10,392.00 for each) was treated as debt.  As a result, Lily Brandon was given 51% of LBB's stock, and the other two groups shared the remaining 49% despite all three groups contributing the same amount.

**B.     Prior to Applying for Section 8(a) Certification, LBB Engaged in Certain Corporate Machinations With No Discernable Business Purpose Other Than To Further Strengthen the False Perception that Lily Brandon Controlled LBB.**

35.     Throughout 1994, LBB engaged in a series of corporate reorganizations that had no business purpose other than to position the company for its anticipated Section 8(a) application.

36.     On or about January 7, 1994, all of LBB's board of directors, except for Lily Brandon, resigned as Officers and Directors of LBB.

37.     Nonetheless, each of the former Directors continued to be employed by LBB in the same roles and with the same titles and salaries they had before their resignations, and Brown (LBB's Treasure) continued to have the authority to sign for LBB on financial matters.

38.     LBB also purportedly set Lily Brandon's salary at $64,000 per year.

39.     Despite the growth of LBB since its formation in 1992, in January 1994 LBB also authorized the sale of stock from Franz and Schofield to Lily Brandon at the same price set for shares at LBB's formation.  As a result of this transaction, Lily Brandon acquired an 81% interest in LBB and Schofield and Franz were left with only 9.5% each.

40.     Notably, SBA's Section 8(a) regulations place limits and notification requirements on non-disadvantaged individuals who own more than 10% of a Section 8(a) business.

41.     Eleven months later on or about December 8, 1994 -- mere days before LBB applied for Section 8(a) certification -- LBB rescinded Brown's authorization to sign for the company on financial matters, which camouflaged his control over LBB's financial matters at the time LBB applied for Section 8(a) certification.  As noted below, shortly after LBB's Section 8(a) application was approved, LBB reinstated Brown's signature authority unbeknownst to the SBA.

**C.    LBB Applied for Section 8(a) Certification and Made Material Misrepresentations In Its Application Materials.**

42.    On or about December 28, 1994, LBB initially applied to obtain Section 8(a) certification from the SBA.

**1.    Misrepresentations in LBB's Initial Section 8(a) Application.**

43.    In that application, LBB, through Lily Brandon, represented that that Lily Brandon made $64,000 per year in salary and LBB, through Edward Brandon, represented that Edward Brandon made $35,000 in salary plus another $7,500 in compensation through the use of a company provided automobile.

44.    Although LBB accurately reported Edward Brandon's other compensation -- *i.e.*, $7,500 through the use of a company car -- it misrepresented Lily and Edward Brandon's salaries for 1994.

45.    LBB's internal records reflect that Lily Brandon received $13,692.16 in salary and Edward Brandon received $10,626.60 in salary from LBB during 1994.

46.    That is, the total compensation Edward Brandon -- a non-disadvantaged individual -- received from LBB in the year that LBB applied for its Section 8(a) certification ($18,126.60) exceeded that of Lily Brandon ($13,692.16) -- the disadvantaged individual upon which LBB's application was based.

47.    This rendered LBB ineligible to participate in the Section 8(a) business development program.

48.    Further, in its initial application materials, LBB represented that Lily Brandon would be "[r]esponsible for the day to day operation of the corporation including all financial and corporate commitments."

49.    LBB further described Edward Brandon's role, Operations, to be limited to "assisting the President in carrying out the operation of the corporation by working with the job sites on a daily basis to ensure that the President's policies and procedures are being implemented."

50.    In actuality, Lily Brandon had no meaningful substantive role in the day-to-day operations of LBB -- that is, Lily Brandon did not: (i) make specific decisions regarding bidding on new business; (ii) oversee LBB's performance of its government contracts on a day-to-day basis; (iii) play any substantive role in the negotiation and formulation of LBB's government contracts; (iv) set and enforce expectations for the company's general managers; (v) formulate specific company practices regarding collective bargaining and interactions with unions; or (vi) oversee the financial performance of LBB on its government contracts.

51.    Instead, Edward Brandon, with the assistance of Brown and Franz, managed LBB's operations on a day-to-day basis, including the areas and tasks noted above.

52.    Lily Brandon's actual role at LBB failed to satisfy the statutory and regulatory requirements of control sufficient to participate in the Section 8(a) business development program.

**2.    Misrepresentations in LBB's Supplement to Its Section 8(a) Application.**

53.    After receiving LBB's initial Section 8(a) application, SBA screened it and requested additional materials from LBB to support its application.

54.    Specifically, the SBA noted that Lily Brandon's resume "does not appear to indicate the necessary managerial and technical skills necessary to operate a manufacturing and related services firm.  Who maintains these skills in your firm?  Please explain fully."

55.     In response to this request, LBB and Lily Brandon further misrepresented Lily Brandon's role at LBB.

56.     Lily Brandon on behalf of LBB represented: (i) that she had management experience in the manufacturing industry; (ii) that she has "direct control over the day-to-day business affairs of the company;" (iii) that her signature is the only one allowed on "company commitments;" (iv) that her signature "is the only signature authorized on checks issued" by LBB; and (v) that she "control[s] all of the finances" of LBB.

57.     Each of these representations was materially false or became materially false and misleading shortly after Lily Brandon made them.

58.     For instance, Lily Brandon did not have any management experience in the manufacturing industry.

59.     Moreover, Lily Brandon played no meaningful role in the day-to-day business of LBB.

60.     Further, shortly after Lily Brandon made these statements and LBB obtained Section 8(a) certification, LBB -- through Lily Brandon -- once again authorized Brown to sign checks and others to make corporate commitments on behalf of LBB.

**D.     The SBA Certified LBB As a Section 8(a) Company Based On LBB's Misrepresentations and LBB Began to Receive Section 8(a) Set-Aside Contracts.**

61.     Based on LBB's false statements, on or about April 6, 1995, the SBA certified LBB as a Section 8(a) company for a period of nine years concluding in April 2004.

62.     Thereafter, LBB consistently marketed itself to government contracting authorities as a Section 8(a) concern -- despite its knowledge that it has falsely obtained that certification.

63.     For example, in its bid materials for government contracts (including both Section 8(a) set-aside contracts and open competition contracts), LBB often in the very first sentence of its proposal cover letter touted itself as a Section 8(a) certified business.

64.     Further, in LBB's contract proposals themselves, LBB regularly held itself to be "a minority, women-owned business, that understands the necessity in providing opportunities for all small and minority business concerns."

65.     As a result of LBB's false statements and its 8(a) certification that followed therefrom, LBB was awarded government contracts.

66.     For example, (a) in or about March 1998, LBB was awarded a contract with the U.S. Army Operational Test and Evaluation Command under the Section 8(a) program; and (b) in or about March 1999, the U.S. Army Material Command Acquisition Center awarded LBB under the Section 8(a) program.

67.     That is, LBB -- a company actually controlled by non-disadvantaged individuals -- received millions of dollars of government contracts intended to benefit and promote the development of companies controlled by socially and economically disadvantaged persons.

**E.     After Receiving its Initial Section 8(a) Certification, LBB Submitted Annual Recertification Materials That Were Materially False and Misleading.**

68.     As part of the Section 8(a) program, LBB was required to certify on an annual basis to SBA that no circumstances changed that could adversely affect the company's Section 8(a) program eligibility.

69.     On or about April 23, 1996, May 7, 1999, April 19, 2001, April 15, 2002, and April 10, 2003, LBB made these certifications to SBA.

70.     For instance, in its May 7, 1999, certification LBB, through Lily Brandon, certified that "there have been no changed circumstances that could adversely affect the company's 8(a) BD Program eligibility."

71.     These certifications were false.

72.     After LBB's initial Section 8(a) certification Lily Brandon's already inadequate control of LBB further weakened.

73.     For instance, although LBB believed it crucial and material to represent in its supplemental certification materials that Lily Brandon was the only person that could commit the company and sign company checks, shortly after receiving its initial certification from the SBA, LBB and Lily Brandon authorized others to sign company checks and commit the company on financial instruments.

74.     Shortly after the SBA certified LBB as a Section 8(a) business, Lily Brandon authorized Brown to once again act on behalf of LBB regarding bank matters.

75.     On or about January 15, 1998, Lily Brandon authorized Rhonda Tomlinson to act for LBB on bank matters, and filed a signature card with LBB's bank, Provident Bank, to effectuate that authorization.

76.     On or about July 7, 1998, Lily Brandon authorized Edward Brandon and David Van Scoyoc to sign documents related to, and required for, daily transaction with LBB's bank, Provident Bank, and filed a signature card with Provident Bank to effectuate that authorization.

77.     Lily Brandon also relinquished her supposed sole control over signing other corporate documents, including modifications and other documents related to government contracts.

78.     Indeed, through this period, Edward Brandon and/or Edward Brandon, Jr. executed numerous documents related to LBB's government contracts on behalf of LBB.

79.     As a further example, on or about January 21, 1999, Lily Brandon authorized Franz to sign for LBB on certain government contract documents.

80.     Lily Brandon's alleged continual day-to-day control of LBB's operations is also belied by numerous internal memoranda sent by Edward Brandon from 1996 to 2004 setting forth requirements that he (not Lily Brandon) be made aware of and authorize a full panoply of company operations, including promotions, union relations, and compensation decisions.

81.     Indeed, in one such memorandum, distributed on or about May 12, 1998, Edward Brandon confirmed that he and Franz were responsible for the "day-to-day matters" of LBB.

**F.      After February 1, 1997, LBB Continued to Receive Contracts Based On Falsely Obtained Section 8(a) Certification and Continued to Submit Claims for Payment on Existing Section 8(a) Contracts With the Implied Certification That It Was a <u>Bona Fide Section 8(a) Business.</u>**

82.     On and after February 1, 1997, LBB continued to actively and aggressively market itself to government contracting personnel as a Section 8(a) business and continued to bid on and receive set-aside contracts based on its falsely obtained and maintained Section 8(a) eligibility.  In so doing, LBB not only represented itself to be a Section 8(a) certified business, but also expressly or impliedly represented itself to be eligible to receive Section 8(a) set-asides under relevant regulatory and statutory authorities.

83.     On and after February 1, 1997, LBB continued to submit claims for payment on existing contracts obtained as a result of its falsely obtained and maintained Section 8(a) certification through invoices and other payment requests.  As LBB's Section 8(a) certification was a material representation in its set aside contracts, with each claim for payment LBB made under those contracts on or after February 1, 1997, it impliedly certified that its Section 8(a)

certification was bona fide at the time it obtained the applicable underlying contract and that it was eligible to have received that underlying contract under the applicable Section 8(a) statutory and regulatory authorities.

84. On and after February 1, 1997, LBB also continued to enter into modifications and renewals of contracts it obtained as a result of its falsely obtained and maintained Section 8(a) certification. As LBB's Section 8(a) certification was a material representation in its set aside contracts, with each modification and renewal LBB obtained regarding those contracts on or after February 1, 1997, it impliedly certified that its Section 8(a) certification was bona fide at the time it obtained the applicable underlying contract and that it was eligible to have received that underlying contract under the applicable Section 8(a) statutory and regulatory authorities.

**G.   Promptly Upon Graduating from the Section 8(a) Program, Lily Brandon Resigned As President and CEO of LBB.**

85. After LBB graduated from the Section 8(a) programs in 2004, LBB's advertised management structure was modified to comport with its actual business operations.

86. That is, after Lily Brandon's disadvantaged status was no longer required to fulfill Section 8(a) program requirements, she resigned as LBB's president, Edward Brandon was promoted to LBB's president, and Franz was promoted to be LBB's Executive Senior Vice President.

**H.   Despite Lily Brandon's Resignation and Edward Brandon's Undisputed Control of LBB After January 1, 2005, LBB Continued to Falsely Represent Its Socio-Economic Status.**

87. After January 1, 2005, despite the fact that LBB was plainly no longer controlled by a woman, LBB continued to misrepresent its socio-economic status.

88. That is, although Edward Brandon and Franz indisputably controlled LBB, LBB nonetheless continued to represent itself to government contracting personnel and externally

market itself as a woman-owned and -operated business even after the initial complaint in this action was filed, which concealed LBB's scheme to falsely obtain and maintain its Section 8(a) certification.

## COUNT I -- FALSE CLAIMS ACT -- FALSE CLAIMS
### 31 U.S.C. § 3729(a)(1) (2007), 31 U.S.C. § 3729(a)(1)(A) (as amended)
(Against LBB)

89.   The United States incorporates by reference the allegations set for in Paragraphs 1 to 88 above as if fully set forth herein.

90.   As described above, LBB falsely obtained and maintained its Section 8(a) certification based on misrepresentations regarding Lily Brandon's actual control over LBB, including, but not limited to: (A) in its initial certification materials, misrepresenting the respective salaries of Lily Brandon and Edward Brandon, and the Lily Brandon having day-to-day control over the operations of LBB; (B) in its supplemental certification materials, misrepresenting that Lily Brandon had direct day-to-day control over LBB, that her signature was the only one that could commit LBB (including on contractual documents, checks, and other financial instruments), and that she controlled all of LBB's finances; and (C) in its annual certifications, misrepresenting that no changes that could affect LBB's eligibility has occurred.

91.   Thereafter, LBB improperly obtained government contracts, and modifications and extensions of those contracts, based on its misrepresentations that it was a bona fide and eligible Section 8(a) business concern.

92.   On and after February 1, 1997, LBB submitted invoices and other actionable false claims for payments under its improperly obtained contracts while impliedly certifying that it was a bona fide and eligible Section 8(a) concern at the time it entered into the applicable underlying contracts.

93.     LBB submitted these false claims with knowledge of, and/or with reckless disregard to, their falsity.

94.     LBB's implied false certifications in this regard were material, as they led the government to make payments that, absent the falsity, it may not have made.

95.     As a result of LBB's false claims made on or after February 1, 1997, the United States was damaged in the amount of the false claims to be determined at trial.

96.     Accordingly, the United States is entitled to treble damages under the False Claims Act plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of the False Claims Act.

### COUNT II -- FALSE CLAIMS ACT -- FALSE RECORDS AND STATEMENTS
### 31 U.S.C. § 3729(a)(2) (2007), 31 U.S.C. § 3729(a)(1)(B), (G) (as amended)
(Against LBB and Lily Brandon)

97.     The United States incorporates by reference the allegations set for in Paragraphs 1 to 96 above as if fully set forth herein.

98.     As described above, LBB falsely obtained its Section 8(a) certification based on numerous misrepresentations in its initial application materials and its supplemental application materials.

99.     On and after February 1, 1997, LBB, through Lily Brandon, made numerous actionable false statements to the government, including the above noted misrepresentations in LBB's annual certifications to SBA (*i.e.*, that no changes that could affect LBB's eligibility has occurred) and in LBB's bid and contract-offer materials it submitted to various government contracting authorities to obtain Section 8(a) set aside contracts (*i.e.*, that LBB was a bona fide and eligible Section 8(a) business concern).

100.    LBB and Lily Brandon made these false statements with knowledge of, and/or with reckless disregard to, their falsity.

101.     LBB's and Lily Brandon's false statements in this regard were material, as they had the natural tendency to influence, or be capable of influencing, the awarding of LBB's Section 8(a) contracts, extensions and modifications of those contracts, and the payments made under LBB's Section 8(a) contracts.

102.     As a result of LBB's and Lily Brandon's false statements made on or after February 1, 1997, the United States was damaged in the amount of the payments made to LBB under its improperly obtained contracts to be determined at trial.

103.     Accordingly, the United States is entitled to treble damages under the False Claims Act plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of the False Claims Act.

**COUNT III -- FALSE CLAIMS ACT -- CONSPIRACY**
**31 U.S.C. § 3729(a)(3) (2007), 31 U.S.C. § 3729(a)(1)(C) (as amended)**
(Against All LBB Defendants)

104.     The United States incorporates by reference the allegations set for in Paragraphs 1 to 103 above as if fully set forth herein.

105.     LBB, Lily Brandon, and Edward Brandon concocted a scheme and maintained that scheme on and after February 1, 1997, to submit false claims and false statements to the United States by falsely obtaining and maintaining LBB's Section 8(a) certification, using that certification to improperly obtain government contracts, and submitting invoices and other demands for payment under LBB's improperly obtained government contracts, as set forth in detail above.

106.     As a result of LBB's, Lily Brandon's, and Edward Brandon's conspiracy to make false statements and submit false claims, the United States was damaged in the amount of the payments made to LBB under its improperly obtained contracts to be determined at trial.

107.    Accordingly, the United States is entitled to treble damages under the False Claims Act plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of the False Claims Act.

### COUNT IV -- COMMON LAW -- NEGLIGENT MISREPRESENTATION
(Against All LBB Defendants)

108.    The United States incorporates by reference the allegations set for in Paragraphs 1 to 107 above as if fully set forth herein.

109.    As described above, LBB, through Lily Brandon, falsely obtained and maintained its Section 8(a) certification based on misrepresentations regarding Lily Brandon's actual control over LBB, including (A) in LBB's initial certification materials, misrepresenting the respective salaries of Lily Brandon and Edward Brandon, and the Lily Brandon having day-to-day control over the operations of LBB, (B) in LBB's supplemental certification materials, misrepresenting that Lily Brandon had direct day-to-day control over LBB, that her signature was the only one that could commit LBB (including on contractual documents, checks, and other financial instruments), and that she controlled all of LBB's finances, (C) in LBB's annual certifications, misrepresenting that no changes that could affect LBB's eligibility has occurred, and (D) in LBB's bid and contract-offer materials it submitted to various government contracting authorities to obtain Section 8(a) set aside contracts misrepresenting that LBB was a bona fide and eligible Section 8(a) business concern.

110.    Also, as described above, as part of LBB's improper attempt to obtain Section 8(a) certification, Edward Brandon misrepresented his salary as part of LBB's initial application.

111.    The LBB Defendants made these false statements or omitted facts that they had a duty to disclose.

112.    The LBB Defendants' false representations in this regard were material.

113.    The United States relied upon the LBB Defendants' false statements.

114.    Further, until the United States was notified by Relators of LBB's wrongful conduct, the LBB Defendants concealed their false representations by, among other things, repeatedly reaffirming LBB's eligibility for its Section 8(a) certification, and thereafter, falsely holding itself out to be a woman-owned and operated business.  These false statements concealed Lily Brandon's actual role at LBB and the falsity of the LBB Defendants' Section 8(a) representations.

115.    As a result of the LBB Defendants' false representations, the United States was damaged in the amount of the payments made to LBB under its improperly obtained contracts to be determined at trial, as the government's funds went to LBB instead of a legitimate and bona fide Section 8(a) business concern.

## COUNT V -- COMMON LAW -- FRAUD
(Against All LBB Defendants)

116.    The United States incorporates by reference the allegations set for in Paragraphs 1 to 115 above as if fully set forth herein.

117.    As described above, LBB, through Lily Brandon, falsely obtained and maintained its Section 8(a) certification based on misrepresentations regarding Lily Brandon's actual control over LBB, including (A) in LBB's initial certification materials, misrepresenting the respective salaries of Lily Brandon and Edward Brandon, and the Lily Brandon having day-to-day control over the operations of LBB, (B) in LBB's supplemental certification materials, misrepresenting that Lily Brandon had direct day-to-day control over LBB, that her signature was the only one that could commit LBB (including on contractual documents, checks, and other financial instruments), and that she controlled all of LBB's finances, (C) in LBB's annual certifications, misrepresenting that no changes that could affect LBB's eligibility has occurred, and (D) in

LBB's bid and contract-offer materials it submitted to various government contracting authorities to obtain Section 8(a) set aside contracts misrepresenting that LBB was a bona fide and eligible Section 8(a) business concern.

118.    Also, as described above, as part of LBB's improper attempt to obtain Section 8(a) certification, Edward Brandon misrepresented his salary as part of LBB's initial application.

119.    The LBB Defendants made these false statements knowing they were false and intending to deceive the United States to obtain LBB's Section 8(a) certification and Section 8(a) contracts.

120.    The LBB Defendants' false representations in this regard were material.

121.    The United States relied upon the LBB Defendants' false statements.

122.    Further, until the United States was notified by Relators of LBB's wrongful conduct, the LBB Defendants concealed their false representations by, among other things, repeatedly reaffirming LBB's eligibility for its Section 8(a) certification, and thereafter, falsely holding itself out to be a woman-owned and operated business.  These false statements concealed Lily Brandon's actual role at LBB and the falsity of the LBB Defendants' Section 8(a) representations.

123.    As a result of the LBB Defendants' false representations, the United States was damaged in the amount of the payments made to LBB under its improperly obtained contracts to be determined at trial, as the government's funds went to LBB instead of a legitimate and bona fide Section 8(a) business concern.

124.    Further, the United States is entitled to punitive damages for LBB Defendants' intentional fraud on the public fisc.

**PRAYER FOR RELIEF**

WHEREFORE, the United States requests that this Court enter judgment in its favor and award it

the following relief:

A.      The amount of the United States damages to be determined at trial;

B.      Treble damages pursuant to the False Claims Act in an amount to be determined

at trial;

C.      Civil penalties pursuant to the False Claims Act for each false claim and false

statement made by LBB not to exceed $11,000 per false claim or false statement;

D.      Punitive damages to be determined at trial;

E.      Interest, costs, and other recoverable expenses permitted by law; and

F.      Such other relief as may be just and appropriate.


**The United States Demands A Trial By Jury On All Claims So Triable**

Dated: August 19, 2011
      Washington, DC

Respectfully submitted,

TONY WEST
Assistant Attorney General

RONALD C. MACHEN JR., D.C. Bar #447889
United States Attorney


By:   ___/s/_____
      RUDOLPH CONTRERAS, D.C. Bar #434122
      LAURIE WEINSTEIN, D.C. Bar #389511
      BRIAN P. HUDAK
      Assistant United States Attorneys
      555 4th Street, NW
      Washington, DC 20530
      (202) 514-7143

JOYCE R. BRANDA
RENÉE BROOKER
LINDA MCMAHON
Attorneys, Commercial Litigation Branch
P.O. Box 261, Ben Franklin Station
Washington, D.C. 20044
(202) 353-8297

*Attorneys for the United States of America*