**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* STEVEN O. SANSBURY, *et al.* | ) ) ) ) |
| Plaintiffs, | ) Civ. Action No. 07-251 (EGS) ) |
| v. | ) ) |
| LB&B ASSOCIATES, INC., *et al.* | ) ) |
| Defendants. | ) ) |

## MEMORANDUM OPINION

Pending before the Court are two motions to dismiss filed by Defendants Edward Brandon, Lily Brandon, and LB&B Associates, Inc. (hereinafter, "LB&B") (collectively, "LB&B Defendants"). Relators brought this action against the LB&B Defendants, as well as Bering Straits AKI, Chilkat Services, Inc., and two individual representatives of those companies pursuant to the *qui tam* provision of the False Claims Act ("FCA"), 31 U.S.C. § 3730(b). Relators allege that Defendants violated the FCA with respect to their participation in the Small Business Association's (hereinafter "SBA") Section 8(a) program and 8(a) Mentor Protégé program. On April 14, 2011, the Government filed its notice of election to intervene in part, electing to intervene in Relators' claims only insofar as they relate to the LB&B Defendants' participation in the Section 8(a) program, but

not the Mentor-Protégé program.  The Government subsequently filed its complaint in intervention on August 19, 2011.  The Government's complaint in intervention asserts two additional causes of action against LB&B Defendants for common law negligent misrepresentation and fraud against the LB&B Defendants.  Pending before the Court are the LB&B Defendants' motions to dismiss both complaints, pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure.[1]  Having carefully considered Defendants' motions to dismiss, the responses and replies thereto, the applicable law, and the record as a whole, Defendants' Motion to Dismiss Relators' complaint is **DENIED** and Defendants' Motion to Dismiss the Government's complaint in intervention is **GRANTED IN PART AND DENIED IN PART**.

## I.  Background

### A.  Statutory Framework

#### 1.  The Section 8(a) Program

The SBA's Section 8(a) program is a business development program for small businesses owned by individuals who are socially and economically disadvantaged.  *See* 15 U.S.C. § 637(a); 13 C.F.R. § 124.1.  Qualifying small businesses that are

---

[1] Because a number of the arguments made in both motions to dismiss overlap, the Court will address the motions together. Further, because only the LB&B Defendants have responded to the complaint, this opinion refers to them throughout as "Defendants."

owned or controlled by socially or economically disadvantaged individuals may apply to the SBA, and if accepted into the program, they are eligible to receive preferential treatment in the form of "set aside" contracts. They are also eligible to receive technological, financial, and practical assistance. Relators' Compl. ¶ 15; Gov't Compl. ¶¶ 19-21.

In order for a small business to participate in the program, it must apply to and be certified by the SBA. It must first meet certain size requirements, *see* 13 C.F.R. Part 21, and it must also be "disadvantaged," which requires that at least fifty one percent of the business is owned and controlled by one or more individuals who are socially and economically disadvantaged. *See* 15 U.S.C. § 637(a)(4)(A)-(B); 13 C.F.R. § 124.105. The program defines socially "disadvantaged individuals" as those who have been "subjected to racial or ethnic prejudice or cultural bias within American society because of their identities as members of groups and without regard to their individual qualities." 13 C.F.R. § 124.103(a); *see also* 15 U.S.C. § 637(a)(5). "Economically disadvantaged" individuals are those socially disadvantaged individuals "whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same or similar line of business who are not socially disadvantaged." 13 C.F.R. § 124.104(a); *see*

*also* 15 U.S.C. § 637(a)(6)(A). A company selected for the program must annually certify its continued eligibility for the Section 8(a) program and must provide financial and other information to the SBA. *See* 13 C.F.R. §§ 124.112(b), 124.509(c), 124.601, 124.602. A company may remain in the program for a maximum of nine years if it continues to meet the eligibility requirements throughout the period, and it may participate in the program only once. *See* 13 C.F.R. §§ 124.2, 124.108(b).

Individuals who are members of certain racial and ethnic groups are considered to be presumptively socially disadvantaged. *See* 13 C.F.R. § 124.103(b)(1); *see also* 15 U.S.C. § 631(f)(1)(B)-(C) (explaining that socially disadvantaged individuals include "members of certain groups that have suffered the effects of discriminatory practices or similar invidious circumstances over which they have no control," including, but not limited to "Black Americans, Hispanic Americans, Native Americans, Indian tribes, Asian Pacific Americans, Native Hawaiian Organizations, and other minorities"). This presumption is rebuttable, and may be overcome by credible evidence to the contrary. *See* 13 C.F.R. § 124.103(b)(3). An individual who is not a member of one of these groups may nonetheless gain admission into the Section 8(a) program by establishing by a preponderance of the evidence

that he or she is socially disadvantaged under criteria set
forth in 13 C.F.R. § 124.103(c).

In the context of the Section 8(a) program, "control"
requires that "both that disadvantaged persons have the power to
control the company and that such persons actually exercise
their authority to control the company."  Gov't Compl. ¶ 26; *see
also* 13 C.F.R. § 124.106.  Although a non-disadvantaged
individual may be involved in the management of a company that
participates in the Section 8(a) program, that individual may
not, *inter alia*, exercise actual control of the company or
receive compensation that exceeds that of the socially or
economically disadvantaged person who controls the company.  *See*
13 C.F.R. § 124.106(e).  Further, non-disadvantaged individuals
who "transfer majority stock ownership or control of the firm to
an immediate family member within two years prior to the
application and remain involved in the firm as a stockholder,
officer, director, or key employee of the firm" are subject to a
rebuttable presumption that they actually control the firm.  *Id.*
§ 124.106(f).

### 2.   Mentor Protégé Program

In addition to the Section 8(a) program, the SBA also
administers a Mentor-Protégé program, which allows a non-Section
8(a) company to form a joint venture with a Section 8(a)
eligible company.  The program is designed to encourage an

approved mentor, that is not a Section 8(a) concern, to provide managerial, financial, and technical assistance in order to improve a protégé's ability to bid on and compete for government contracts. *See* 13 C.F.R. § 124.520(a)-(b). The protégé must be in the development stage of participation in the Section 8(a) program, have never received an 8(a) contract, or have a size that is half the size of the corresponding NAICS code. *Id.* § 124.520(c).

In order to participate in the program, a mentor and protégé must submit their joint venture agreement to the SBA for approval. *Id.* § 124.513(a)(1). The Section 8(a) participant must be the "managing venturer" of the joint venture, and an employee of the Section 8(a) concern must be designated as the project manager responsible for overall contract performance. *Id.* § 124.513(c)(2). Where the "8(a) concern brings very little to the joint venture relationship in terms of resources and expertise other than its 8(a) status, SBA will not approve the joint venture agreement." *Id.* § 124.513(a)(2). The applicable regulations specifically provide that "[n]o determination of affiliation or control may be found between a protégé firm and its mentor based on the mentor/protégé agreement or any assistance provided pursuant to the agreement." *Id.* § 124.520(d)(4).

### B. Factual Background

LB&B is a North Carolina company that has its principal place of business in Columbia, Maryland. It was certified by the SBA as a Section 8(a) concern on April 6, 1995. This certification was based on the status of President Lily Brandon, who is an Asian Pacific American. Relators' Compl. ¶¶ 7, 29; Gov't Compl. ¶ 12. Both Relators were employed at LB&B -- Steven O. Sansbury was employed as an Operations and Maintenance Institutional Planner from 2000 until his separation from the company in 2003, Relators' Compl. ¶ 4; James Buechler was employed as an Assistant Project Manager at the FDA from July 2003 until August 2005, *Id.* ¶ 5.

### 1. Allegations in the Government's Complaint in Intervention[2]

LB&B was incorporated in 1992. Govt. Compl. ¶ 28. Initially, the Board of Directors of the company had six members, only two of whom were socially and economically disadvantaged: Ms. Brandon and her son, F. Edward Brandon Jr. Relators and the Government allege that neither possessed sufficient skills or experience to run a company engaged in LB&B's main lines of business -- government contracts, manufacturing, facilities management, and government services. *Id.* ¶¶ 29-30. Three of the other directors, including Defendant

---

[2] These allegations relate to claims made in both the Relators' complaint as well as in the United States' complaint in intervention.

F. Edward Brandon, Ms. Brandon's husband, had extensive experience in government contracting and the other lines of business. *Id.* ¶ 31. Despite her alleged lack of experience, Ms. Brandon was selected as the president of the company. Moreover, though she contributed substantially the same amount as the other directors, Ms. Brandon's financial contribution was treated as equity and she was given 51 percent of the company's stock. *Id.* ¶¶ 33-34.

In 1994, prior to applying for Section 8(a) certification, all of the directors of the company except for Ms. Brandon officially resigned, though they stayed on as employees with the same titles and salaries as before their resignations. *Id.* ¶¶ 35-37. The Government alleges that two of the original directors sold their stock to Ms. Brandon at this time at the share price set at the time of the company's formation despite the fact that the company had grown in the interim. As a result of this sale, Ms. Brandon acquired an 81 percent interest in the company. *Id.* ¶ 39.

On December 28, 1994, LB&B initially applied for Section 8(a) certification. The Government alleges that there were a number of misrepresentations on the initial application. For instance, Ms. Brandon's salary was listed as $64,000 and Mr. Brandon's total compensation was listed at $42,500. According to the Government, Ms. Brandon's salary was actually $13,692.16

while Mr. Brandon's total compensation was $18,126.60. Because

Mr. Brandon's salary allegedly exceeded that of Ms. Brandon,

LB&B would have been ineligible to participate in the Section

8(a) program. *Id.* ¶¶ 43-47.

Further, on its application, LB&B represented that Ms.

Brandon would be responsible for the day-to-day operation of the

company and described Mr. Brandon's role as limited to assisting

the president. *Id.* ¶¶ 48-49. However, the Government alleges

that Ms. Brandon had "no meaningful substantive role" in the

daily operations of the company, and did not:

> (i) make specific decisions regarding bidding on new
> business; (ii) oversee [LB&B's] performance of its
> government contracts . . . ; (iii) play any
> substantive role in the negotiation and formulation of
> [LB&B's] government contracts; (iv) set and enforce
> expectations for the company's general managers; (v)
> formulate specific company practices regarding
> collective bargaining and interactions with unions; or
> (vi) oversee the financial performance of [LB&B] on
> its government contracts.

*Id.* ¶ 50. Those functions were instead overseen by Mr. Brandon

and others. *Id.* ¶ 51. Thus, the Government alleges that Ms.

Brandon's actual role at the company "failed to satisfy the

statutory and regulatory requirements of control sufficient to

participate in the Section 8(a) business development program."

*Id.* ¶ 52.

After receiving LB&B's initial application for

certification, the SBA requested additional materials from the

company.  The SBA specifically noted that Ms. Brandon's résumé
did not appear to indicate that she had the necessary skills to
manage and operate the company.  The SBA asked LB&B to provide a
fuller explanation of who had such skills at the company.  *Id.* ¶
54.  The Government alleges that in responding to this request
for information, Defendants further misrepresented Ms. Brandon's
skills and role by stating that she had prior management
experience in the manufacturing industry, that she had direct
control over daily operations, that only she could sign company
commitments and checks, and that she controlled the finances of
the company.  *Id.*  ¶¶ 56-60.

The Government alleges that on the basis of these
misrepresentations, the SBA certified LB&B as a Section 8(a)
concern on April 6, 1995 for a period of nine years to conclude
in April 2004.  *Id.* ¶ 61.  On the basis of this certification,
LB&B was able to market itself as a Section 8(a) program
participant and bid on "set-aside" contracts, which the
Government contends it began to actively and aggressively do
after February 1, 1997.  *Id.* ¶¶ 62-67; 82-84.  Moreover, on the
yearly certifications that it submitted after April 1995, the
Government alleges that LB&B continued to falsely certify, as it
had on its original application, that Ms. Brandon controlled the
company and that she was the only person at the company who
could commit monies and sign company checks.  *Id.* ¶¶ 68-81.  For

instance, during this period, the Government alleges that at least five additional people at the company had the authority to sign company checks and make commitments. *Id.* According to the Government, that Ms. Brandon did not actually control the company is further evidenced by the numerous company memoranda issued by Mr. Brandon between 1996 and 2004 on the full range of company operations. *Id.* ¶¶ 80-81.

After LB&B "graduated" from the Section 8(a) program in 2004, the Government alleges that Ms. Brandon resigned as president and Mr. Brandon officially took on the role he had been performing for years. *Id.* ¶¶ 85-86. Nevertheless, LB&B purportedly continued to represent itself as a woman-owned and – operated business until at least 2007. *Id.* ¶ 88.

## 2. Allegations in Relators' Complaint

In addition to the allegations above, Relators also allege that Defendants engaged in fraud in two joint ventures that LB&B entered into with Section 8(a) concerns under the SBA Mentor Protégé program. Relators allege that in late 2003 and early 2004, prior to its "graduation" from the Section 8(a) program, LB&B began to search for protégé companies "so that it could continue to illegally benefit from the 8(a) programs' [sic] advantages on bids on government contracts." Relators' Compl. ¶ 50. To that end, Relators claim that LB&B entered into discussions with Bering Straits Aki, LLC (hereinafter "BSA"), an

Alaskan, Inuit company owned by Defendant Gail Schuber, regarding a proposed mentor-protégé relationship. *Id.* ¶¶ 50-52. On August 16, 2004, a little over four months after LB&B exited the Section 8(a) program, the SBA approved a joint venture agreement between LB&B and BSA, pursuant to which the joint venture was able to secure several government contracts, including contracts with the Centers for Medicare & Medicaid Services, the General Services Administration Public Buildings Services, the Federal Emergency Management Agency, and the United States Air Force. *Id.* ¶¶ 52-53. Relators allege that the project managers for these contracts were LB&B employees until January 2005, which was after the joint venture was approved by the SBA. *Id.* ¶ 55. These project managers purportedly did not switch their employment to BSA until January 2005, when they were instructed to do so by a senior vice president at LB&B. *Id.* ¶ 56.

LB&B also entered into a mentor-protégé relationship with Ckilkat Services, an Alaskan corporation, at some point in 2006. *Id.* ¶ 64. Also in 2006, LB&B hired Sheldon L. Jahn as a senior vice president. Relators allege that Mr. Jahn's employment was transferred from LB&B to Chilkat in late 2006 or early 2007, after the SBA had already approved the joint venture, so that he could serve as the general manager of the joint venture. *Id.*

    **C.  Procedural History**

On or about December 27, 2004, Relators filed an action alleging similar claims relating to Defendants' participation in the Section 8(a) program in the United States District Court for the District of Maryland. *See United States ex rel. Sansbury v. LB&B Associates, Inc.*, No. 04-4018. On May 5, 2006, the Government filed a notice of its election not to intervene.

After the Government declined to intervene in the District of Maryland action, Relators filed a sealed *qui tam* complaint in this court on February 1, 2007, alleging violations of the FCA. The United States was contemporaneously served with the Complaint. The Government filed several motions for an extension of time to determine whether it would intervene in the claims raised in Relators' complaint. During this time, the Government met with both Relators and Defendants and attempted to resolve the matter short of continued litigation. On April 14, 2011, the Government filed a notice of election to intervene; it elected to intervene in that part of the action that relates to Defendants' participation in the Section 8(a) program and declined to intervene in the remaining claims relating to participation in the Mentor-Protégé program. Upon the unsealing of the action before this Court on June 29, 2011, Defendants moved to unseal the District of Maryland action, which was eventually unsealed on October 13, 2011. On August 19, 2011, after Defendants were served with Relators' complaint,

the Government filed its complaint in intervention.  Defendants filed motions to dismiss both the Relators' complaint and the Government's complaint in intervention.  Those motions are now ripe for determination by this Court.

## II.  Standard of Review

### A.  Rule 12(b)(6)

A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of the complaint.  *See Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  In order to be viable, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks and citations omitted).  The plaintiff need not plead all of the elements of a prima facie case in complaint, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511-14 (2002), nor must the plaintiff plead facts or law that match every element of a legal theory.  *See Krieger v. Fadely et al.*, 211 F.3d 134, 136 (D.C. Cir. 2000).

However, despite these liberal pleading standards, to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted);

*Twombly*, 550 U.S. at 562. A claim is facially plausible when the facts plead in the complaint allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). While this standard does not amount to a "probability requirement," it does require more than a "sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556).

"[W]hen ruling on a defendant's motion to dismiss [pursuant to Rule 12(b)(6)], a judge must accept as true all of the factual allegations contained in the complaint." *Atherton v. D.C. Office of the Mayor et al.*, 567 F.3d 672, 681 (D.C. Cir. 2009) (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)). The court must also give the plaintiff "the benefit of all inferences that can be derived from the facts alleged." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)(internal citation omitted). Despite this, a court need not "accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint. *Id.* Further, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are not sufficient to state a claim. *Iqbal*, 556 U.S. at 678 (internal citation omitted).

**B.    Rule 9(b)**

This Circuit has held that complaints brought under the False Claims Act are subject to the heightened pleading requirements of Fed. R. Civ. P. 9(b). *See United States ex rel. Totten v. Bombardier Corp. and Envirovac, Inc.*, 286 F.3d 542, 551-52 (D.C. Cir. 2002) ("Every circuit to consider the issue has held that, because the False Claims Act is self-evidently an anti-fraud statute, complaints brought under it must comply with Rule 9(b)."). Rule 9(b) requires that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). This specificity requirement "normally . . . means that the pleader must state the time, place and content of the false misrepresentations, the fact misrepresented and what was obtained or given up as a consequence of the fraud." *United States ex rel. Joel D. Joseph v. Cannon*, 642 F.2d 1373, 1385 (D.C. Cir. 1981) (internal quotation marks omitted).

Likewise, in the context of the FCA, "the circumstances that must be pleaded with specificity are matters such as the time, place, and contents of the false representations, such representation being the *element* of fraud about which the rule is chiefly concerned." *Totten*, 286 F.3d at 552 (internal citation omitted) (emphasis in original); *Shekoyan v. Sibley Int'l. Corp.*, 217 F. Supp. 2d 59, 73 (D.D.C. 2002) (noting that in the FCA context, "a claimant must typically allege the

identity of the person who made the fraudulent statement, the time, place and content of the misrepresentation, the resulting injury, and the method by which the misrepresentation was communicated") (internal citation omitted).

### C. False Claims Act

The FCA provides a civil penalty and treble damages against any individual who: (1) knowingly presents or causes to be presented a false or fraudulent claim for payment or approval by the United States, 31 U.S.C. § 3729(a)(1); (2) knowingly makes, uses, or causes to be made or used, a false record or statement material to getting a false or fraudulent claim paid or approved by the Government, *id.* § 3729(a)(2); or (3) conspires to defraud the United States by getting a false or fraudulent claim allowed or paid, *id.* § 3729 (a)(3). To enforce these and other provisions of the FCA, a private person, known as a "relator," may bring a civil or *qui tam* action in the government's name. 31 U.S.C. § 3730(b)(1). If the government elects to intervene, it shall then have the primary responsibility for prosecuting the action, although the relator may continue as a party to the action, subject to certain limitations enumerated in the statute. *Id.* § 3730(c)(1).

### III. Discussion

### A. Relators' Standing to Bring FCA Claims Related to Participation in 8(a) Program

Defendants first argue that, because the Government has intervened in this action with respect to the claims regarding their participation in the 8(a) program, those claims have been rendered impermissibly duplicative, and Relators thus lack standing to bring them.  *See* Defs.' MTD Relators' Compl. at 19-20.  Relators argue that Defendants cannot seek to dismiss the portions of their complaint in which the Government has intervened.  Rather, they argue that the only way for Defendants to limit their participation is to file a motion pursuant to 31 U.S.C. § 3730(c)(2)(D), which states that "[u]pon a showing by the defendant that unrestricted participation during the course of the litigation by the person initiating the action would be for purposes of harassment or would cause the defendant undue burden or unnecessary expense, the court may limit the participation by the person in the litigation."  Relators' Opp'n at 17 (quoting 31 U.S.C. § 3730(c)(2)(D)).  The Government agrees that its complaint in intervention is the operative complaint as to all claims in which it has intervened.  However, the Government notes that Relators also still have the right to continue in the action as parties with respect to those intervened claims.  The Government therefore recommends that the Court deny as moot Defendants' motion to dismiss the Section 8(a) claims in Relators' initial complaint.  *See* Gov't's Opp'n at 5 n.1.

The FCA states that "[a] person may bring a civil action for a violation of section 3729 for the person and for the United States government." 31 U.S.C. §3730(b)(1). Thus, the statute explicitly gives a relator the right to proceed as a real party in interest in a *qui tam* action. The statute does not indicate that a relator does not retain standing after the government intervenes. In fact, the statute provides for the opposite, stating: "If the Government proceeds with the action, it shall have the primary responsibility for prosecuting the action, and shall not be bound by an act of the person bringing the action. Such person *shall have the right to continue as a party to the action* . . . ." 31 U.S.C. § 3730(c)(1) (emphasis added). Thus, by automatic operation of the statute, the Government's complaint in intervention becomes the operative complaint as to all claims in which the government has intervened. *See United States ex rel. Feldman v. City of New York*, 808 F. Supp. 2d 641, 648-49 (S.D.N.Y. 2011)). However, a relator's initial complaint continues to be the operative complaint for all non-intervened claims and relators remain a party to the Government's intervened claims and continue to have rights to participate in those claims under 31 U.S.C. § 3730(c)(1) and to receive any relator's recovery permitted by 31 U.S.C. § 3730(d), subject to the limitations of the FCA and the facts and circumstances a particular case. Defendants can only

seek to have the Court limit relators' participation pursuant to 31 U.S.C. § 3730(c)(2)(D).

Most other courts that have addressed this issue have dismissed relators' superseded claims. *See, e.g. Feldman*, 808 F. Supp. 2d at 649 (dismissing relator's amended complaint for lack of standing because it was "superseded in its entirety by the Government's Amended Complaint"); *United States ex rel Magee v. Lockheed Martin Corp.*, No. 09-324, 2010 U.S. Dist. LEXIS 23295, at *8-*9 (S.D. Miss. Mar. 12, 2010) (same); *United States ex rel. Becker v. Tools & Metals, Inc.*, No. 3:05-CV-0627, 2009 U.S. Dist. LEXIS 27507, at *6, *17-*19 (N.D. Tex. March 31, 2009); *In re Pharm. Indus. Average Wholesale Price Litig.*, No. 01-12257, 2007 U.S. Dist. LEXIS 89835, at *17 (D. Mass. Dec. 6, 2007) ("[O]nce the government has intervened, the relator has no separate free-standing FCA cause of action.") (citing *United States ex rel. Barajas v. Northrop Corp.*, 147 F.3d 905, 910 (9th Cir. 1998))); *but see United States ex rel. Landis v. Tailwind Sports Corp.*, No. 10-cv-976, 2014 U.S. Dist. LEXIS 83313 (D.D.C. June 19, 2014), at *23-*28 (refusing to dismiss relators' intervened claims on the basis that they no longer had standing because the text of the FCA does not require it).

However, dismissal is by no means required especially where, as here, Defendants have made no showing that the Relators' participation during the course of the litigation will

cause them undue burden or expense that would justify limiting their participation. Therefore, because the Government's complaint in intervention supersedes Relators' complaint with respect to the intervened claims, and because Relators have the right to continue as parties to this action, the Court will deny Defendants' motion to dismiss Relators' claims, to the extent that they are duplicative of the Government's claims, as moot.

**B.    Statute of Limitations**

1.    Government's FCA Claims pre-February 2001

Defendants argue that all of the Government's FCA claims that predate February 1, 2001 are barred by the statute of limitations. The FCA provides that:

A civil action under section 3730 may not be brought--

(1) more than six years after the date on which the violation of section 3729 is committed, or

(2) more than three years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed,

whichever occurs last.

31 U.S.C. § 3731(b). The Act further states that "[f]or statute of limitations purposes, any . . . Government pleading shall relate back to the filing date of the complaint of the person who originally brought the action, to the extent that the claim

of the Government arises out of the conduct, transactions, or occurrences set forth, or attempted to be set forth, in the prior complaint of that person." *Id.* § 3731(c).[3]

Neither party disputes that the Government's claims arise out of the conduct, transactions, and occurrences set forth in Relators' complaint, and that the Government's complaint thus "relates back" to the date of the filing of Relators' complaint. Defs.' MTD Govt.'s Compl. at 15-16; Govt.'s Opp'n at 11. Defendants argue that because the Government did not file its complaint in intervention within three years of the date when it should have known of any potential claims – that is, February 1, 2007, the date on which Relators filed their initial complaint – the Government cannot avail itself of the ten-year statute of limitations in section 3731(b)(2), and thus only a six-year statute of limitations applies. Therefore, according to Defendants, the Government may only maintain claims for violations that are alleged to have occurred after February 1,

---

[3] Section 3731(c) was added as an amendment as part of the Fraud Enforcement and Recovery Act of 2009. As the D.C. Circuit held in *United States ex rel. Miller v. Bill Harbert International Construction, Inc.*, 608 F.3d 871, 879-80 (D.C. Cir. 2010), the 2009 amendments to Section 3731 apply to this matter as "the provision permitting relation back was made expressly 'applicable to cases pending on the date of enactment.'" *Miller*, 608 F.3d at 878 (quoting Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, § 4(f)(2), 123 Stat. 1617, 1625).

2001, six years prior to the filing of Relators' complaint.  MTD
Govt.'s Compl. at 16.

The Government argues that Defendants ignore a fundamental
principle of the *qui tam* mechanism:  "that for statute of
limitations purposes, the Government stands in the shoes of the
relator."  Govt.'s Opp'n at 9.  Thus, if a relator's claim is
timely, so too will a government complaint in intervention
alleging the same wrongdoing be timely, regardless of when it is
filed.  *Id.*  The Government admits that it was aware of
Relators' claims beginning on or around December 27, 2004, when
the same Relators filed a *qui tam* action in the United States
District Court for the District of Maryland.  *Id.* at 5, 12-14.
The Government argues that because the initial complaint in this
action was filed by *Relators* on February 1, 2007, within three
years of the date when *U.S. officials* became aware of the claims
on December 27, 2004, the Government's complaint in intervention
can apply to claims as far back as February 1, 1997, even though
the Government did not file its complaint in intervention until
August 19, 2011.  *Id.* at 12-14.  The Government's theory then
is that it can avail itself of the ten year statute of
limitations in section 3731(b)(2) by operation of section
3731(c)'s relation-back provision.

The Government provides no support for its theory that if
the *Relator* files its initial complaint within three years of

when the *Government* should have been aware of certain claims, the relation-back provision allows for the Government to take advantage of the ten-year statute of limitations, starting from the date of filing of the Relators' initial complaint. Indeed, the only case cited by the Government, *United States ex rel. Serrano v. Oaks Diagnostics Inc.*, 568 F. Supp. 2d 1136 (C.D. Cal 2008), is entirely irrelevant. There, in a pre-FERA case, the court addressed the question of whether the government's complaint in intervention related back to relator's complaint, which was filed almost five years prior to the complaint in intervention. The court ruled that the government's complaint did relate back to the relator's complaint after conducting an exhaustive analysis of relation-back principles under Fed. R. Civ. P. 15. *Id.* at 1139-42. Because relator had filed the original complaint within three years of the alleged conduct, the court did not address which statute of limitations would apply. *Id.* at 1142. Here, in a case to which the FERA amendments apply, Relators did not file their original complaint within three years of the alleged conduct, which spans as far back as 1994, when Defendants first applied for the Section 8(a) program. Even accepting that the Relators' District of Maryland action is relevant here, that action was not filed until December 2004.

Similarly, the cases on which Defendants rely also do not address the precise issue presented here as most of them predate the 2009 amendments. *See United States ex rel. Frascella v. Oracle Corp.*, 751 F. Supp. 2d 842 (E.D. Va. 2010); *United States ex rel. Purcell v. MWI Corp.*, 520 F. Supp. 2d 159 (D.D.C. 2007); *United States v. Intrados/Int'l Mgmt. Group*, 265 F. Supp. 2d 1 (D.D.C. 2002). Indeed, all of these cases hold that the relation-back provision allows the government to take advantage of the six-year statute of limitations from the date of the filing of the relator's initial complaint, a point that is not in dispute here.

For instance, in *Frascella*, defendants, like Defendants here, argued that many of the government's claims were barred by the applicable statute of limitations. 751 F. Supp. 2d at 848. There, relator filed his sealed complaint on May 29, 2007 and the government filed its complaint in intervention on July 29, 2010, more than three years after relator's initial complaint. *Id.* The *Frascella* court, however, did not reach the precise question raised here - whether the Government can avail itself of the ten-year statute of limitations even where it failed to file a complaint in intervention within three years of Relator's complaint - because the government conceded that it should have known of any potential claims against defendant when relator filed his complaint. *Id.* at 849 n.3. Instead, the government

argued that claims based on alleged false statements made
thirteen years prior to the filing of relator's complaint were
timely because the U.S. officials charged with responsibility to
act could not reasonably have known of those claims prior to the
filing of relator's complaint.  *Id.* at 849.  The *Frascella* court
found the government's argument unavailing because a 1998 audit
by the GSA had uncovered some of the same false statements
alleged in relator's complaint.  The government, the court held,
was thus on inquiry notice of these statements such that a
reasonable person would investigate.  *Id.* at 851-853.  Despite
Defendants' contention that the facts of *Frascella* are identical
to those here, there was no earlier filed *qui tam* action at
issue in *Frascella* that the government claimed was the specific
starting date for statute of limitations purposes.  *See* Defs.'
MTD Govt.'s Compl. at 17.

Similarly, the issue before the court in *Purcell* was
analytically distinct.  There, in a pre-FERA case, defendants
argued that the government's claims against the president of the
company, who was not named as a defendant in relator's
complaint, were time barred because they were not filed within
three years of the date that a relevant government official
became aware of them.  520 F. Supp. 2d at 169.  In ruling on a
prior motion to dismiss, the *Purcell* court denied defendant's
motion on the grounds that it did not have enough information,

at that state in the litigation, to assess whether the claims were timely. *Id.; see also United States ex rel Purcell v. MWI Corp.*, 254 F. Supp. 2d 69, 78 (D.D.C. 2003). After discovery, defendants reiterated their arguments regarding the timeliness of the government's claim during summary judgment proceedings and the court agreed. 520 F. Supp. 2d at 169-170. The court applied the "discovery-due diligence" standard, under which "a plaintiff is deemed to have sufficient notice of critical facts to set the statute of limitations running if the plaintiff has inquiry notice of the injury and its cause." *Id.* at 170 (citing *United States v. Kubrick*, 444 U.S. 111, 120 (1979). Because the relator's complaint, filed more than three years prior to the government's complaint in intervention, did provide the government with evidence supporting its case against defendants, the government's claims were time barred. *Id.* at 170-72. The Court again did not consider the impact of a previously filed *qui tam* action, and the government did not attempt to avail itself of the ten-year limitations period.

Finally, Defendants cite to *Intrados*, which is also inapposite. That case, while brought under the FCA, was not a *qui tam* action. Instead, the United States directly sued defendants under the Act. In doing so, the government argued that claims based on conduct that occurred more than six years prior to the filing of its complaint were timely because

defendants had concealed the alleged fraud.  265 F. Supp. 2d at 10.  The court ruled that the government "did not exercise due diligence in uncovering the fraud," especially because a relevant audit of the alleged fraudulent conduct was completed more than three years before the filing of the government's complaint.  *Id.* at 11.  Thus, claims relating to invoices submitted more than six years before the filing of the government's complaint were time barred.  *Id.* at 10-11.

The plain text of section 3731(b)(2) appears to only relate to the government.  However, several courts, including one in this District, have concluded that where the government does not intervene, the relator can take advantage of the tolling provision in section 3731(b)(2).  *See, e.g.*, *U.S. ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc.*, 474 F. Supp. 2d 75, 82-89 (D.D.C. 2007) (collecting cases evidencing a three-way split among jurisdictions about whether and when relators may invoke the tolling provision, and holding that relators may take advantage of the tolling provision even where the government does not intervene and that the limitations period is measured by the knowledge of the relevant government official); *see also U.S. ex rel. Malloy v. Telephonics Corp.*, 68 Fed. App'x 270, 273 (3d Cir. 2003) (holding that relators may invoke the tolling provision and basing the tolling period's start on the relator's own knowledge); *U.S. ex rel. Ven-A-Care of the Fla. Keys, Inc.*

*v. Actavis Mid Atlantic LLC*, 659 F. Supp. 2d 262, 273-74 (D. Mass. 2009) (concluding that relators may invoke the tolling provision and basing the beginning of the period on the knowledge of the relevant government official). This view, while not a majority view, does offer some support for the Government's theory – if the Relators here can take advantage of 3731(b)(2), their initial complaint was filed within three years of the date when the Government first became aware of the claims. And if the Government's complaint in intervention relates back to the date the Relators' complaint was filed, then the Government's claims can span as far back as February 1, 1997.

As explained above, none of the cases cited by either party adequately describe the situation currently before the Court, where Relator filed a second suit in a different court within three years of the relevant U.S. official learning of the alleged fraud through the filing of the first suit. Nor is the Court aware of any such cases. Thus the court must look to the text of the statute for guidance. *See Murphy Exploration & Prod. Co. v. United States DOI*, 252 F.3d 473, 480 (D.C. Cir. 2001) (citing *Carter v. United States*, 530 US. 255, 271 (2000)). By its express terms, section 3731(b)(2) is silent as to whether it applies to Relators. However, subsection (b) of section 3731 begins by stating that it applies to "civil action[s] under

section 3730," which includes actions brought by both the Government and Relators.[4]  That prohibition, however, does not apply here as Relators are proceeding pursuant to section 3730(b).  Section 3731(b) concludes with "whichever occurs last."  This language is not included in subsections (a) or (b), but rather is offset in the same way as the introductory

---

[4] The Supreme Court has held that the limitations period in Section 3731(b) applies only to actions brought pursuant to Sections 3730(a) and (b), but not to retaliation actions brought by *qui tam* plaintiffs pursuant to Section 3730(h).  *See Graham County Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 545 U.S. 409, 415-422 (2005).

Another court in this District, relying on *Graham*, has found that section 3731(b)(2) does not apply to Relators.  *See Landis*, 2014 U.S. Dist. LEXIS 83313 at *44-*53.  There, in determining whether a relator could take advantage of section 3731(b)(2)'s tolling provision in an action in which the Government had intervened, the court declined to follow *Pogue* and held that "it is not reasonable to construe Section 3731(b)(2) to mean that the application of tolling to relator's lawsuit turns on the knowledge of the responsible United States government official, when the government has in fact declined to prosecute the claims brought by the relator and the government has not intervened or become a party to the relator's lawsuit."  *Id.* at 51.  The court reasoned that the "most reasonable and intuitive construction of section 3731(b)(2) is that 'a civil action under section 3730' does not apply to all actions under section 3730, but only as to those actions in which the United States has 'acted,' by seeking to participate."  *Id.*  Thus, the court held that with respect to Relators claims against non-intervened defendants, the six year statute of limitations in section 3731(a) applied.  This holding, however, does not in any way impact the effect of the tolling provision on claims for which the government has intervened and whether those claims are timely if a relator files suit within three years of the relevant government official's knowledge.

language.  This indicates that the two subsections are to be
read together.  *See Pogue*, 474 F. Supp. 2d at 85.

Thus, looking at the language of section 3731(b) as a
whole, it seems clear that it includes Relators, at least in
actions in which the Government has intervened, and there is
nothing in section (b)(2) to suggest that Relators are excluded.
*See Pogue*, 474 F. Supp. 2d at 84; *see also Landis*, 2014 U.S.
Dist. LEXIS 83313 at *51.  This reading of Section 3731(b) is
also consistent with *Graham*, in which the Supreme Court did not
differentiate between relators and the government with respect
to actions brought under section 3730(b).  545 U.S. at 415.

The legislative history of section 3731(b) also supports
this interpretation of the statute.  The Senate report on the
1986 amendments to the FCA states that section 3731(b)(2)'s
tolling provision means that the "statute of limitations does
not begin to run until the material facts are known by an
official within the Department of Justice with the authority to
act in the circumstances."  S. Rep. No. 345, 99th Cong., 2d
Sess., 30 (July 28, 1986), *reprinted in* 1986 U.S.C.C.A.N. 5266.
Similarly, the House report noted that fraud was often difficult
to detect, thus the statute extended the statute of limitations.
However, the House Report also explained that "the Committee did
not intend to allow the Government to bring fraud actions *ad
infintum* [sic], and therefore imposed the strict 10 year limit

on False Claims Act cases."  H. Rep. No. 660, 99th Cong., 2d

Sess., 25 (June 26, 1986).  This legislative history indicates

that Congress intended the limitations period to run based on

the knowledge of the government.

Following the reasoning of *Pogue*, which allows relators to

take advantage of the tolling provision of section 3731(b)(2) if

they file a complaint within three years of the relevant

government official learning of the fraud, which they did here,

the Court finds that the government's claims dating back to

February 1, 1997 are timely.  As the *Pogue* court noted,

"[m]easuring (b)(2)'s limitations period by the government's

knowledge, and never the relator's, makes sense because it means

that . . . the government will be able to recover upon the

maximum amount of claims within the overall ten-year repose

period."  474 F. Supp. 2d at 88.

## 2.   The Government's Remaining Tort Claims

In addition to its claims pursuant to the FCA, the

Government has also brought claims for common law fraud and

negligent misrepresentation.  These claims are governed by 28

U.S.C. § 2415, the general federal statute of limitations, which

provides that "every action for money damages brought by the

United States or an officer or agency thereof which is founded

upon a tort shall be barred unless the complaint is filed within

three years after the right of action first accrues."  28 U.S.C.

§ 2415(b).  Because claims of negligent misrepresentation and fraud sound in tort, they are governed by this three year statute of limitations, *Intrados*, 265 F. Supp. 2d at 14, subject to tolling where "facts material to the right of action are not known and reasonably could not have been known by an official of the United States charged with the responsibility to act in the circumstances." 28 U.S.C. § 2416(c).

Defendants argue that because the Government's common law claims were brought more than three years after the date the relevant Government official could reasonably have known of them, *i.e.*, February 1, 2007, they are time-barred and must be dismissed.  Defs.' MTD Govt.'s Compl. at 25.  The Government argues to the contrary that its fraud claims are also subject to section 3731(c)'s relation back provision because it provides that if the Government elects to intervene in a *qui tam* action, it may file its own complaint to "clarify or add detail to the claims in which the Government is intervening *and to add any additional claims with respect to which the Government contends it is entitled to relief*."  Govt.'s Opp'n at 17 (quoting 31 U.S.C. § 3731(c)) (emphasis in original).  Thus, the Government argues that the tolling provision of section 3731(b)(2) applies to its common law claims and that its claims relating to conduct after February 1, 1997 are timely.  *Id.* at 18 n.8.

The Government is correct that its complaint in intervention relates back to the filing of Relator's complaint, because it arises out of the same conduct, transaction, or occurrence. *Frascella*, 751 F. Supp. 2d at 854. However, it does not then follow that the ten-year statute of limitations in section 3731(b)(2) applies to the Government's common law claims; the statute of limitations in 28 U.S.C. § 2415(b) still applies. Thus, the Court must count back from February 1, 2007 to determine which claims are timely. Accordingly, to the extent that the Government's fraud and negligent misrepresentation claims arise out of factual allegations that predate February 1, 2004, they are time-barred.

## C.   Relators' and Government's Failure to State a Claim

It is axiomatic that a plaintiff bringing an action for fraud under the FCA must, first and foremost, allege that an actual false claim or statement was presented to the government. *See Totten*, 286 F.3d at 551; *U.S. ex rel. Head v. Kane Co.*, 798 F. Supp. 2d 186, 195-96 (D.D.C. 2011). The FCA defines "claims" to include "any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(c). Congress has emphasized that the FCA should be broadly interpreted "to reach all types

of fraud . . . that might result in financial loss to the Government." *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968). Accordingly, "[f]alse claims under the FCA take a variety of forms." *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1266 (D.C. Cir. 2010). These include: (1) presentment claims; (2) fraudulent inducement claims; and (3) false certification (express or implied) claims. *See id.* (endorsing implied false certification theory as basis for FCA claims in D.C. Circuit); *U.S. ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.*, 393 F.3d 1321, 1326 (D.C. Cir. 2005) (recognizing that claims based upon fraudulent inducement are actionable under the FCA).

To state a claim for a false claim under the FCA, a plaintiff must show that "(1) the defendant submitted a claim to the government, (2) the claim was false, and (3) defendant knew the claim was false." *United States ex rel. Harris v. Bernard*, 275 F. Supp. 2d 1, 6 (D.D.C. 2003). The FCA does not require proof of specific intent to deceive when a defendant presents false or fraudulent claims to the government. 31 U.S.C. § 3729(b); *United States v. TDC Mgmt. Corp., Inc.*, 24 F.3d 292, 296 (D.C. Cir. 1994).

An FCA plaintiff may also plead a claim under 31 U.S.C. § 3729(a)(1)(B), which provides a cause of action against anyone who "knowingly makes, uses, or causes to be made or used, a

false record or statement material to a false or fraudulent claim." Section 3729 (a)(1)(B) attaches FCA liability to a defendant who prepares in support of a claim a statement that it knows to be a misrepresentation. *United States ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 500-01 (D.C. Cir. 2004).

### 1. Relators Have Stated a Mentor-Protégé Program Claim

According to Defendants, Relators' sole allegation that Defendants violated the FCA with regard to its participation in the Mentor-Protégé program is that Defendants "falsely certified in the joint venture agreements submitted to SBA for approval . . . that the joint venture employed general managers who were from 8(a), Alaskan, Intuit companies." Defs.' MTD Relators' Compl. at 22 (citing Compl. ¶ 71). As such, Defendants argue that Relators have failed to state a claim under the FCA regarding their participation in the Mentor-Protégé program. Defendants make three arguments in support of dismissal. First, they argue that there are no requirements in the SBA regulations regarding the general manager of a mentor-protégé joint venture, as opposed to *project* managers. Therefore, according to Defendants, Relators' allegations regarding John Krulic and Sheldon Jahn, who are described in the complaint as "general managers," are completely irrelevant. Second, Defendants argue that Relators' own complaint demonstrates that the alleged

representations regarding Mr. Krulic's and Mr. Jahn's employment were true.  In their complaint, Relators allege that these two individuals "switched" employment, but they provide no factual allegations in support of their speculation.  Indeed, as Defendants note, Relator Sansbury was no longer employed during the relevant time period, and Relator Buechler did not work at any of the relevant job site locations.  Finally, Defendants argue that any alleged "switch" in employment is not a violation of the relevant SBA regulations.

According to the applicable SBA regulations, when a mentor and protégé partner for the purpose of an 8(a) contract, they must submit a joint venture agreement to the SBA for approval. 13 C.F.R. § 124.513.  The agreement must contain, *inter alia*, "a provision . . . [d]esignating an 8(a) Participant as the managing venturer of the joint venture," and an employee of the managing venturer as the project manager responsible for performance of the 8(a) contract.  *Id.* § 124.513(c)(2).  Here, Relators have alleged that Defendants made false representations regarding the employment of several project managers of the relevant joint ventures.  According to Relators' complaint, which must be taken as true at this stage in the litigation, James Krulic was listed as the general manager of the BSA-LB&B joint venture on the joint venture agreement approved by the SBA on August 16, 2004 despite the fact that he was an LB&B employee

at the time.  Relators' Compl. ¶ 52.  Relators further allege that Mr. Krulic did not become a BSA employee until January 2005, well after the joint venture was approved and even then only at the direction of senior employees at LB&B.  *Id.* ¶¶ 53-56.  With respect to the Chilkat joint venture, Relators allege that Mr. Jahn was a senior vice president at LB&B during 2006, and that LB&B and Chilkat entered into a joint venture agreement in which he was listed as the project manager.  *Id.* ¶¶ 63-64. Relators allege that in late 2006 or early 2007, Mr. Jahn's employment was switched to Chilkat for the purposes of the joint venture agreement.  *Id.* ¶ 64.  Relators do not provide a specific date for the approval of the joint venture, noting only that it was approved "in or about 2006."  *Id.* ¶ 64.  Relators also contend that Relator Buechler did in fact work with the BSA/LB&B joint venture.  *See* Relators' Opp'n at 22 n.6 (citing Compl. ¶¶ 61-62).

Relators additionally allege that although Mr. Krulic and Mr. Jahn were listed as "general managers" by defendants, they were, in actuality, project managers.  According to Relators, they were employees of LB&B and then moved over to the joint venture, such that the relevant "project manager" was *not* from an 8(a) protégé company.  *See id.* at 20-21.  Relators also contend that they should be allowed to conduct discovery on the work these men performed to see if Defendants were in

contravention of the applicable regulations. *See id.* at 21; *see also Allen v. Beta Constr.*, 309 F. Supp. 2d 42, 47 (D.D.C. 2004) ("[W]hile significant details [] will be necessary . . . these details are not necessary at this very preliminary stage of litigation.").

Further, Relators also allege that Defendants listed Andrew F. Van Der Stuyf, Edward J. Keenan, Donald Wilson, and Donald Krauth as project managers on contracts secured pursuant to the mentor-protégé relationship. These contracts were entered into in October, November, and December 2004. At the time of contracting, Mr. Van Der Stuyf, Mr. Keenan, Mr. Wilson, and Mr. Krauth were purportedly employees of LB&B, despite the fact that they were listed as project managers. *See* Relators' Compl. ¶¶ 53-55. Relators allege that they did not "switch" their employment to BSA until the end of January 2005. *Id.* ¶ 57. According to Relators, all four were only employees of BSA on paper. *Id.*

Relators have provided more than the requisite "short and plain statement of the claim showing that [they are] entitled to relief." *Twombly*, 550 U.S. at 555 (internal quotation marks and citations omitted). They have also stated more than just one false claim or statement in the relevant joint venture agreements. As such, Defendants cannot credibly argue that they are not on notice of the claims against them with respect to

their joint ventures with BSA and Chilkat or the false claims or statements they allegedly made in connection with those joint ventures. While Relators may not have pled sufficient facts to ultimately succeed on the merits of their claim, that is not required at this stage in the litigation. "Indeed, [Relators], having first stated a claim with sufficient specificity," which the Court finds that they have for the reasons stated in Section III.B.2 *supra*, "must be allowed to fill in those details through the discovery process, especially because these details are in defendants' possession and will be identified when produced in discovery." *Allen*, 309 F. Supp. 2d at 47.

2.    Relators and the Government Have Stated Their Claims with Adequate Particularity

Defendants argue that the Government's Section 8(a) claims and Relators' claims relating to their participation in the Mentor-Protégé program fail because they have failed to plead those claims with the particularity required by Fed. R. Civ. P. 9(b).[5] Defendants argue that the "Government has failed to sufficiently identify what was given up as a consequence of the alleged fraud" because it has not "identified a single specific false claim or invoice for payment or the date(s) or cost(s) of

---

[5] The Court need not analyze Defendants' arguments with respect to Relators' Section 8(a) claims because the Government's Complaint in Intervention supersedes those claims and is the operative complaint with respect to those claims. *See* Section III.A *infra*.

any such claims." Defs.' MTD Gov't Compl. at 21. According to
Defendants, the Government has provided only two examples of
contracts that were allegedly fraudulently obtained. *Id.*
Further, Defendants argue that both the Government and Relators
have alleged an open-ended time frame for their claims. *Id.*;
Defs.' MTD Relators' Compl. at 25-26. With respect to Relators'
claims, Defendants argue that they consist of nothing more than
allegations that "all defendants" obtained "approval of joint
ventures under the SBA's 8(a) Mentor-Protégé Program through
misrepresentation, and that LB&B subsequently obtained contracts
and payments based on those misrepresentations." Defs.' MTD
Relators' Compl. at 25. Additionally, Defendants argue that
Relators claims are deficient because they "(a) do not specify
particular claims or payments made in relation to the alleged
fraudulent activity; (b) do not allege any fraudulent activity
on the part of Lily Brandon or Ed Brandon; (c) make allegations
'upon information and belief;' [and] (d) make general
allegations against all Defendants in their Complaint." *Id.* at
26.

It is well established in this Circuit that "the simplicity
and flexibility contemplated by the rules must be taken into
account" when reviewing a complaint under Rule 9(b). *United
States ex rel. McCready v. Columbia/HCA Healthcare*, 251 F. Supp.
2d 114, 116 (D.D.C. 2003). Most importantly, Rule 9(b)'s

particularity requirement must be read in concert with Rule 8, which requires only that a complaint contain a "short and plain statement" of the claim.  *See Cannon*, 642 F.2d at 1386 (holding that "[t]he requirement of particularly does not abrogate Rule 8, and it should be harmonized with the general directives . . . of Rule 8 . . . ") (internal citations and quotation marks omitted); *Allen*, 309 F. Supp. 2d at 46.

Defendants' narrow reading of Rule 9(b) would essentially eviscerate this standard and require claimants to provide detailed proof of their allegations at this early stage in the litigation.  That is simply not what is required on a motion to dismiss pursuant to Rule 9(b).  *Pogue*, 238 F. Supp. 2d at 269. Rather, at this stage in the litigation, an FCA "plaintiff need not allege with specificity every element of its cause of action if the complaint contains allegations from which an inference may be drawn that the plaintiff will produce evidence on the essential elements."  *Intrados*, 265 F. Supp. 2d at 7.  Indeed, the language of Rule 9(b) makes clear that "particularity [must be pled] only with respect to the circumstances constituting fraud. . . ."  *United States ex rel. Folliard v. CDW Tech. Servs., Inc.*, 722 F. Supp. 2d 20, 27 (D.D.C. 2010).  This is especially true where, as here, the Government's FCA claims are based on a fraudulent "scheme," in which the circumstances make it likely that the alleged fraud was "consummated through the

presentment of false claims." *United States ex rel. Head v. Kane*, 798 F. Supp. 2d 186, 203 (D.D.C. 2011) (quoting *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009)).

The Government argues that it has pled its FCA "false claim" and "false statement" claims with particularity. Specifically, the Government contends that it is has set forth: (1) the who (the LB&B Defendants); (2) the what (express and implied representations regarding the extent of Ms. Brandon's control of LB&B and its eligibility for the Section 8(a) program); (3) the when (on or after February 1, 1997 in certifications to the SBA and in set-aside contracts, and until LB&B's graduation from the 8(a) program); (4) the where or with whom (the SBA and Government agencies that award set-aside contracts); (5) the how (claims for payment submitted pursuant to set-aside contracts that were obtained based on a fraudulent 8(a) certification, statements in annual 8(a) certifications, and contract materials submitted by the SBA to Government agencies to secure 8(a) contracts); and (6) damages (Section 8(a) contracts and modifications/extensions to those contracts, and payments on invoices made pursuant to those contracts). Gov't's Opp'n at 22.

Similarly, Relators argue that their claims relating to Defendants' participation in the SBA Mentor-Protégé program

survive a Rule 9(b) challenge.  According to Relators, they have alleged a claim of fraud in the inducement.  Relators' Opp'n at 24-26.  They also contend that they have not alleged an open ended time frame – they have stated that the LB&B/BSA joint venture was approved in 2004 and that the LB&B/Chilkat joint venture was approved in 2006.  They argue that these facts are sufficient at this stage in the litigation.

Both the Government's and Relators' allegations relating to Defendants' participation in the Section 8(a) program and the Mentor-Protégé program plainly meet Rule 9(b)'s pleading requirements.  They have both detailed the circumstances of the fraudulent schemes relating to both programs, and they have identified which defendants were involved in those schemes. They have provided specific time frames – the Government alleges that LB&B's fraud began in approximately 1994 and continued throughout the time that the company participated in the Section 8(a) program; Relators allege that LB&B's fraud began in August 2004 with respect to the BSA joint venture and in 2006 with respect to the Chilkat joint venture.  That neither the Government nor Relators provide a precise end date for the fraud does not defeat their claims.  *See Kane*, 798 F. Supp. 2d at 204 (finding that relator's allegations that a fraudulent plan began in 1999 and continued to "the present time" was "sufficient in a case involving a complex, fraud scheme"); *United States ex rel.*

*Harris v. Bernad*, 275 F. Supp. 2d 1, 8 (D.D.C. 2003) (holding that in a case involving a complex fraud scheme that lasted for a number of years, an allegation that the fraud was perpetrated from 1993 to the present was sufficient); *Pogue*, 238 F. Supp. 2d at 268 (concluding that allegations that a complex fraud scheme occurred over a twelve-year period satisfied Rule 9(b)).

The Government also clearly links Defendants' false claims and statements to payments made by various Government agencies. *See* Govt.'s Compl. ¶ 66 (noting that in March 1998 LB&B was awarded a set aside contract with the U.S. Army Operational Test and Evaluation Command and in March 1999 it was awarded a contract with the U.S. Army Material Command Acquisition Center). Those allegations are sufficient; the Government is not required to plead specific dates, invoices, or payment amounts pursuant to a Section 8(a) scheme that spanned many years. *Folliard*, 722 F. Supp. 2d at 31 ("Although defendants argue that relator must provide 'transaction dates' on which individual claims were submitted, this is incorrect."). Indeed, this court has routinely held that "'while Rule 9(b)'s particularity requirement applies to the [contention] that the request was fraudulent,' Rule 12(b)(6)'s 'general standards apply to the . . . existence of a request for payment.'" *Kane*, 798 F. Supp. 2d at 205 (quoting *Folliard*, 722 F. Supp. 2d at 27).

Relators have also provided sufficient details, including the specific joint venture agreements and the fact that project managers listed on the agreements as being employees of the protégé companies were actually LB&B employees at the time those representations were made. Relators have further alleged that LB&B employees were aware of those facts and directed the relevant employees to switch their employment to the protégé companies. They need not allege more at this stage. *See Allen*, 309 F. Supp. 2d at 46; *see also United States ex rel. Westrick v. Second Chance Body Armor, Inc.*, 685 F. Supp. 2d 129, 137 (D.D.C. 2010) (holding that the government had alleged enough on a motion to dismiss by alleging the defendant had predicated each sale with a fraudulent representation).

Thus, the Court finds that both the Government and Relators have provided more than enough detail to satisfy Rule 9(b)'s purpose of guaranteeing Defendants have "'sufficient information to allow for preparation of a response.'" *United States ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1256 (D.C. Cir. 2004) (quoting *Cannon*, 642 F.2d at 1385). "While significant details which will be necessary for plaintiff[s] to succeed on the merits of the case are indeed absent, these details are not necessary at this very preliminary stage of litigation." *Allen*, 309 F. Supp. 2d at 47. Relators and the Government must be allowed the opportunity to fill in these

details through the discovery process. *See id.* Accordingly, Defendants' motions to dismiss the Government's and Relators' claims for failure to plead them with sufficient particularity are denied.

### 3. Relators' and Government's False Claims Act Conspiracy Claims

Defendants also move to dismiss the Government and Relators FCA conspiracy claims pursuant to Rule 12(b)(6) because they have not pled any agreement or overt act. Defendants additionally argue that the FCA conspiracy claims are barred by the intra-corporate conspiracy doctrine.

Section 3729(a)(3) of the FCA attaches liability to anyone who "conspires to defraud the Government by getting a false or fraudulent claim allowed or paid." The FCA does not define "conspiracy," but "courts have held that general civil conspiracy principles apply to FCA conspiracy claims." *Westrick*, 685 F. Supp. 2d at 140. Thus, the intra-corporate conspiracy doctrine, a principle of civil conspiracy law, applies to FCA conspiracies as well. Under this doctrine, "a corporation cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves." *United States ex rel. Fago v. M&T Mortg. Corp.*, 518 F. Supp. 2d 108, 117 (D.D.C. 2007).

There is no dispute that Defendants Edward Brandon and Lily Brandon are or were employees of Defendant LB&B.  Thus, any conspiracy claims between these individual Defendants and LB&B fail pursuant to the intra-corporate conspiracy doctrine.  *See Kane*, 798 F. Supp. 2d at 201-02 (dismissing an FCA conspiracy claim where plaintiffs had alleged a conspiracy between employees of the corporation and the corporation itself).  Thus, the Government's conspiracy claims fail to state a claim.

However, to the extent that Relators have alleged a conspiracy between employees of LB&B, LB&B itself, BSA, and/or Chilkat, those claims are not barred under that doctrine.  In order to state a claim for conspiracy pursuant to the FCA, Relators must show "(1) that defendant[s] conspired with one or more persons to have a fraudulent claim paid by the United States, (2) that one or more of the conspirators performed any act to have such claim paid by the United States, and (3) that the United States suffered damages as a result of the claim." *United States v. Bouchey*, 860 F. Supp. 890, 893 (D.D.C. 1994).  Here, Relators have alleged that LB&B conspired with BSA and Chilkat to form a joint venture that did not meet the applicable requirements; that the project managers listed on the joint venture agreements were LB&B employees, not employees of the protégé companies, as required; that at some point after the joint ventures were approved, the relevant employees switched

their employment from LB&B to the protégé companies; and that the joint ventures were able to secure set aside contracts as a result of the misrepresentation.  At this stage in the litigation, Relators have alleged sufficient facts to survive a motion to dismiss.  *See Westrick*, 685 F. Supp. 2d at 141 (finding that assertions of meetings between employees of two companies were sufficient to state a claim for conspiracy).

### D.  Relators' Claims Against Remaining Defendants

Relators did not serve Bering Straits AKI, Chilkat Services, or the individual named Defendants from those companies.  Thus, the Court will *sua sponte* dismiss their claims against those Defendants pursuant to Fed. R. Civ. P. 4(m), which provides that "[i]f a defendant is not served within 120 after the complaint is filed, the court . . . must dismiss the action without prejudice against that defendant."

## IV.  Conclusion

For the reasons stated above, the Court **DENIES** Defendants' Motion to Dismiss Relators' complaint and **GRANTS IN PART AND DENIES IN PART** Defendants' Motion to Dismiss the Government's complaint in intervention.

**SO ORDERED.**

Signed:    **Emmet G. Sullivan**
           **United States District Judge**
           **July 16, 2014**